UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARRYL SARTAIN** | **CIVIL ACTION** |
| **versus** | **NO. 07-5903** |
| **LYNN COOPER, WARDEN,** <br> **AVOYELLES PARISH CORRECTIONAL CENTER** | **SECTION: "J" (6)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2).[1] Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is now a statutorily mandated determination. According to Section 2254(e)(2), the district court generally may hold an evidentiary hearing only when the petitioner has shown that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable (28 U.S.C. § 2254(e)(2)(A)(i)) or the claim relies on a factual basis that could not have been previously discovered through the exercise of due diligence (28 U.S.C. § 2254(e)(2)(A)(ii)); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner (28 U.S.C. § 2254(e)(2)(B)).

Petitioner, Darryl Sartain, is a state prisoner incarcerated at the Avoyelles Correctional Center, Cottonport, Louisiana. On March 27, 1997, petitioner was convicted for four counts of armed robbery in violation of Louisiana law.[2] On April 10, 1997, he was sentenced on each count to a concurrent term of fifty years imprisonment without benefit of parole, probation, or suspension of sentence.[3] On that same date, petitioner's counsel indicated that he was filing a notice of appeal, whereupon the trial judge set the return date as June 9, 1997, and appointed the Indigent Defender Program to represent petitioner on appeal.[4] For reasons not apparent from the face of the state court record, that appeal apparently did not proceed and, as a result, petitioner filed a motion for an "out of time appeal" on or about August 20, 1997,[5] which was granted on October 29, 1997.[6] On December 1, 1999, the Louisiana Fourth Circuit Court of Appeal then affirmed petitioner's

---

[2] State Rec., Vol. IV of VI, transcript of March 27, 1997, pp. 232-33; State Rec., Vol. I of VI, minute entry dated March 27, 1997; State Rec., Vol. II of VI, jury verdict forms. On that same date he was also convicted of one count of attempted armed robbery; however, that conviction was reversed on appeal and, therefore, is not challenged in this proceeding.

[3] State Rec., Vol. IV of VI, transcript of April 10, 1997; State Rec., Vol. I of VI, minute entry dated April 10, 1997.

[4] State Rec., Vol. IV of VI, transcript of April 10, 1997, pp. 11-13.

[5] State Rec., Vol. II of VI.

[6] State Rec., Vol. II of VI, Judgment on Motion for Out of Time Appeal; State Rec., Vol. I of VI, minute entry dated October 29, 1997.

convictions and sentences for the four counts of armed robbery.[7]  The Louisiana Supreme Court subsequently denied petitioner's related writ application on September 15, 2000.[8]

On or about December 6, 2000, petitioner filed with the state district court an application for post-conviction relief[9] which was denied on January 25, 2001.[10]  On March 16, 2001, the Louisiana Fourth Circuit Court of Appeal denied petitioner's related writ application.[11]  He then filed a writ application with the Louisiana Supreme Court; however, that application was dismissed at his request on June 29, 2001.[12]  At some unknown time, petitioner apparently filed another related writ application relating to that post-conviction application.  That second writ application was denied by the Louisiana Supreme Court on October 4, 2002.[13]

On or about August 16, 2002, petitioner filed with the state district court a motion for reconsideration of the original post-conviction denial along with a request to pursue a

---

[7] State v. Sartain, 746 So.2d 837 (La. App. 4th Cir. 1999) (No. 98-KA-0378); State Rec., Vol. III of VI.

[8] State v. Sartain, 769 So.2d 4 (La. 2000) (No. 2000-K-0341); State Rec., Vol. V of VI.

[9] State Rec., Vol. II of VI.

[10] State Rec., Vol. V of VI, Judgment dated January 25, 2001; State Rec., Vol. I of VI, minute entry dated January 26, 2001.

[11] State v. Sartain, No. 2001-K-0399 (La. App. 4th Cir. Mar. 21, 2001) (unpublished); State Rec., Vol. II of VI.

[12] State ex rel. Sartain v. State, 794 So.2d 808 (La. 2001) (No. 2001-KH-1155); State Rec., Vol. V of VI.

[13] State ex rel. Sartain v. State, 826 So.2d 1117 (La. 2002) (No. 2001-KH-3033); State Rec., Vol. II of VI.  The state has been unable to provide a copy of that writ application; however, the Louisiana Supreme Court's ruling indicated that the writ application was related to the Court of Appeal's ruling in case number 2001-K-0399.

supplemental claim.[14] The trial judge ordered that the state respond to that motion[15] but then apparently took no further action on the motion.

On January 26, 2005, petitioner, through counsel, filed with the state district court another application for post-conviction relief.[16] The state objected to the application as untimely; however, the trial judge ruled that he would nevertheless consider the application.[17] In response to that ruling, the state then filed a writ application with the Louisiana Fourth Circuit Court of Appeal.[18] On November 29, 2006, the Court of Appeal granted that writ application and dismissed the post-conviction application as untimely.[19] Petitioner then filed with the Louisiana Supreme Court a petition for a writ of certiorari which was denied on June 22, 2007.[20]

On September 24, 2007, petitioner, through counsel, filed the instant federal application for *habeas corpus* relief claiming that his trial counsel was ineffective. The state contends that petitioner's federal application is untimely. However, perhaps anticipating the Court's difficulties in finding the application untimely based on the record before it, the state alternatively argues that petitioner's claims have no merit.

---

[14] State Rec., Vol. II of VI.

[15] State Rec., Vol. II of VI, Order dated August 19, 2002.

[16] State Rec., Vol. II of VI.

[17] State Rec., Vol. V of VI, transcript of September 14, 2006.

[18] State Rec., Vol. V of VI.

[19] State v. Sartain, No. 2006-K-1388 (La. App. 4th Cir. Nov. 29, 2006) (unpublished); State Rec., Vol. V of VI.

[20] State v. Sartain, 959 So.2d 502 (La. 2007) (No. 2007-KP-0012); State Rec., Vol. VI of VI.

Timeliness

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final." Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review. 28 U.S.C. § 2244(d)(1)(A).[21]

In the instant case, the state argues that petitioner's convictions became final when he failed to file an appeal within five days of his sentencing on April 10, 1997. However, La.C.Cr.P. art. 914(A) provides that a motion for appeal may be made orally in open court. As previously noted, petitioner's counsel clearly made such a motion at the sentencing hearing on April 10, 1997, and the court even appointed appellate counsel for petitioner. Although a purported "out of time appeal" was also later granted, this Court is loath to penalize petitioner by failing to give him the full benefit of the doubt on this issue, especially in light of the timely oral motion for appeal, the ambiguities in the state court record, and the clear lack of petitioner's fault with respect to any confusion on the part of the state courts regarding the appeal. Accordingly, based on the record before it and out of an abundance of caution, the Court finds that petitioner's convictions became "final" for AEDPA purposes on December 14, 2000, when his ninety-day period expired for seeking a writ of certiorari from the United States Supreme Court with respect to the Louisiana Supreme Court's judgment on direct appeal. See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott

---

[21] Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Berry v. Cain, Civ. Action No. 06-6749, 2008 WL 859250, at *3 (E.D. La. Oct. Mar. 28, 2008); see also U.S. Sup. Ct. R. 13(1).

Normally, petitioner's federal limitations period would then have commenced on that date. However, the AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court. 28 U.S.C. § 2244(d)(2). By the time the limitations period would have normally commenced on December 14, 2000, petitioner had already filed his first post-conviction application, thereby entitling him to tolling. Further, the limitations period remained tolled until at least June 29, 2001, when the Louisiana Supreme Court issued its judgment denying petitioner's related writ application. See Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004). Accordingly, it was at that point the federal limitations period actually commenced.

From that point on, however, the state court record is insufficient to afford this Court an adequate basis for calculating with certainty the timeliness of the instant petition. For example, at some unknown point, petitioner filed with the Louisiana Supreme Court another writ application of some sort relating to his first post-conviction application. That writ application, which was assigned docket number 2001-KH-3033 and was denied without reasons assigned on October 4, 2002, has not been produced by the state in this proceeding. Nevertheless, because it clearly related to the post-conviction application,[22] and because this Court has no basis for determining that it was

---

[22] As previously noted, the Louisiana Supreme Court's decision indicated that the writ was taken with respect to case number 2001-K-0399, which was the Court of Appeal's ruling on the post-conviction application.

improperly filed, the Court finds that petitioner would be entitled to tolling credit for that application.

Further, while this Court cannot determine precisely when that writ application was filed, its docket number, 2001-KH-3033, clearly indicates that it was filed in 2001. Even if it was filed as late as December 31, 2001, no more than one hundred eighty-four (184) days of the limitations period elapsed prior to its filing.

Moreover, by the time that writ application was ultimately denied on October 4, 2002, petitioner had already again tolled the limitations period on August 16, 2002, by filing motion for reconsideration of the original post-conviction denial and the request to pursue a supplemental post-conviction claim. Because the trial court apparently never ruled on that motion, the limitations period arguably has been tolled since that filing.

Accordingly, based on the record before it, this Court has no basis for finding with certainty that more than one-hundred eighty-four (184) days of the one-year limitations period elapsed prior to the filing of this federal application on September 24, 2007. In light of the inconclusive evidence on the timeliness issue, and because petitioner's claims are clearly meritless for the following reasons, the undersigned recommends that the petition simply be dismissed on the merits. See Trussell v. Bowersox, 447 F.3d 588, 590 (8th Cir.) (a federal court may, in the interest of judicial economy, proceed to the merits of a *habeas* petitioner's claims even if his petition is arguably untimely), cert. denied, 127 S.Ct. 583 (2006).

## Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Sabrina Keelan testified that on October 29, 1994, she was working at the Exxon service station located on Chef Menteur Highway. At approximately 8:00 p.m., two men came into the store and robbed her. One of the men, a black man, wearing a camouflage jacket and a dark colored hard hat, pointed a large black handgun in her face and told her to give him the money in the cash register. The other man, a white man, acted as the "look out". After he took the money, the two men left. Ms. Keelan further testified that the two men ran across the highway. She then called the police. When the police arrived, she gave them a description of the perpetrators. In a photographic lineup and at trial, Ms. Keelan identified the defendant as the person who pointed the gun at her and robbed her.
> Javid Osman was working at the Shell service station located at 5401 Crowder Boulevard on November 3, 1994. At 11:00 a.m., a black man walked up to the counter and asked Osman for five nickels for a quarter. When Mr. Osman opened the register, the subject pulled a gun and told Osman to give him all the money. At trial, Osman testified that the gun appeared to be a black nine millimeter automatic. The subject left after Osman gave him the money. The subject got into the passenger side of a waiting vehicle. In a photographic lineup and at trial, Mr. Osman identified the defendant as the person who robbed him.
> Ms. Elmira Jefferson is the owner-operator of the Chevron service station located at 3201 Chef Menteur Highway. On November 7, 1994, Ms. Jefferson and her daughter were working at the service station when the defendant entered the store. Ms. Jefferson was kneeling down by the safe with her back to the register when she heard someone say, "Give it up." She did not pay attention as she thought someone was joking. When she heard the person say, "Give it up, bitch," she looked up and saw the defendant holding a gun on her daughter. Ms. Jefferson told her daughter to give the money to the defendant. The defendant then pointed the gun at Ms. Jefferson; Ms. Jefferson gave the defendant the money she had been putting in the safe. Ms. Jefferson testified that the weapon used by the defendant was a long black gun. The defendant left the store after Ms. Jefferson gave him the money. She saw him jump a fence and get into a car. A customer in the store stated that the vehicle was blue. Ms. Jefferson immediately called the police. She gave a

description of the perpetrator to the police officer. She described the perpetrator as a black male, approximately five feet six inches to five feet seven inches, thin build, wearing a cap with a Band-Aid underneath his left eye. Ms. Jefferson identified the defendant in a photographic lineup and at trial as the perpetrator.

Sabrina Bridges was working at a Texaco service station in New Orleans East on November 11, 1994. At approximately 7:25 a.m., the defendant walked into the store and asked Ms. Bridges were [sic] the bubble gum was located. Ms. Bridges directed the defendant to the aisle where bubble gum could be found. The defendant picked up some bubble gum and walked to the counter. He placed the gum and some change on the counter. The defendant then pulled a gun out and told Ms. Bridges to give her the money. Ms. Bridges opened the register and gave him the money. The defendant then left the store. Ms. Bridges observed the defendant walk to a nearby hotel and get into a green vehicle. Ms. Bridges locked the store's doors and called the police. When the police arrived, she gave the officers a description of the perpetrator. Ms. Bridges told the officers that the perpetrator was of a medium height and slender. He was wearing black jeans, a striped shirt and a green hat. The perpetrator had an unlit cigarette in his mouth. A few hours later, a police officer returned to the service station and asked Ms. Bridges to accompany him to a house near Michoud. As they passed in front of a house on North Nemours Street, Ms. Bridges saw the defendant and identified the defendant as the person who robbed her. At trial, Ms. Bridges identified the defendant as the perpetrator of the armed robbery.

Timothy Barnes testified that he and the defendant were involved in several armed robberies in October and November of 1994. He admitted that he had pled guilty to the armed robberies and was sentenced to serve nine years at hard labor on each count, the sentences to run concurrently. Barnes stated that he met the defendant in October of 1994 when he moved to New Orleans from Kentucky. Barnes testified that he and the defendant, who was armed with a gun, robbed an Exxon service station on October 29, 1994 and used a green vehicle for their transportation. Barnes further testified that he was also involved in an armed robbery, which occurred on November 11, 1994, at a location on North Galvez. Barnes stated that he used a bluish-black BB gun, which looked like an automatic handgun, in the robbery. Barnes was arrested on November 11, 1994, at a crack house near Michoud.

New Orleans Police Officer Farrell St. Martin assisted in the robbery investigations and the defendant's arrest. On the morning of

November 11, 1994, Officer St. Martin investigated an armed robbery, which occurred that morning at a Shell service station located at 5501 Crowder Boulevard. The officer went to the service station and spoke with the manager and a customer who witnessed the robbery. After receiving information about the armed robbery, Officer St. Martin returned to his office to complete his report. While at his office, he received a phone call from Officer Gunther. As a result of this phone call, Officer St. Martin proceeded to the Chevron service station located at the intersection of Chef Menteur and Michoud. The Chevron station had been robbed the night of November 10, 1994. He spoke with a Chevron employee and received a video tape of the robbery. At that time, Officer St. Martin called his supervisor to see if the videotape could be shown to the attendant at the Shell service station that had been robbed that morning. During the conversation with his supervisor, Officer St. Martin observed a green Mazda 626 turning off of Chef Menteur onto Michoud in a lake bound direction. The officer asked the station attendant to tell his supervisor that he was in pursuit of the vehicle described in the armed robbery of the Shell station that morning. Officer St. Martin followed the vehicle. He notified the dispatcher that he was in pursuit and gave a description of the vehicle. The vehicle turned on Lamaze Street towards North Nemours Street. Officer St. Martin and another officer were able to stop the vehicle. The defendant was driving the vehicle. An unknown black female was in the front passenger seat. Officer St. Martin advised the defendant that he and the vehicle were under investigation for armed robbery. He then asked the defendant the whereabouts of the white man who had been driving the vehicle. The defendant took the officer to 13535 North Nemours Street. The officer entered the residence and located the white man, later identified as Timothy Barnes. Officer St. Martin recovered a pellet gun in the vehicle. The gun resembled a semi-automatic nine millimeter. The gun was located on the driver's side floorboard. After the officer retrieved the gun, he returned to the house and obtained a consent to search the residence from the woman who resided there. Clothing and a helmet were recovered from the residence.

Officer Daniel Wharton was also involved in the defendant's arrest on November 11, 1994 and assisted in the pursuit of the defendant's vehicle. He was on the scene when Officer St. Martin stopped the vehicle. Officers St. Martin and Wharton informed the defendant that the vehicle had been used in an armed robbery but a white male was seen driving the vehicle. The officers asked the

- 10 -

defendant the white man's name.  In response, the defendant pointed to a house on North Nemours.  The officer located Timothy Barnes in the house. The officers recognized Barnes from the surveillance tape taken from the Chevron service station.

Officer David Patrolia, and his partner, Officer Gerald Kuhn, also assisted in the defendant's arrest.  The defendant had been identified as the perpetrator of the armed robbery of the Exxon service station in New Orleans East.  The defendant matched the description of the perpetrator as seen on surveillance videotape of the robbery.  Officer Patrolia conducted a photographic lineup with Sabrina Keelan, the attendant at the Exxon service station when it was robbed.

... Officer [Justin] Crespo ... performed the follow-up investigations of armed robberies, which occurred at the Shell service station on Crowder Boulevard on November 30, 1994 and the Chevron service station on Chef Menteur Highway on November 7, 1994. Officer Crespo conducted photographic lineups with Mr. Javid Oslam, the attendant at the Shell station, and Mrs. Elmira Jefferson, the owner-operator of the Chevron service station.  Mr. Oslam and Mrs. Jefferson identified the defendant as the person who robbed them.

William B. Williams, an investigator with the Orleans Parish District Attorney's Office, testified that he viewed the surveillance tapes at the Seventh District Police Station.  The Seventh District was the only office that had the equipment to view the tapes.  Special equipment was needed to view the time lapsed video tapes.  Still photographs were made from the videotapes when the Seventh District refused to release the equipment to the District Attorney's office.[23]

### Petitioner's Claims

Petitioner claims that his trial counsel was ineffective.  In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that

---

[23]  State v. Sartain, 746 So.2d 837, 841-44 (La. App. 4th Cir. 1999) (No. 98-KA-0378); State Rec., Vol. III of VI.  The facts relating to the reversed conviction for attempted armed robbery have been deleted.

- 11 -

counsel's performance was deficient *and* that the deficient performance prejudiced his defense. See Strickland, 466 U.S. at 697.

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner bears the burden of proof when asserting an ineffective assistance of counsel claim. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. Strickland, 466 U.S. at 697.

In the instant application, it is first claimed that trial counsel was ineffective in failing to fully investigate the case prior to trial and in failing to interview and subpoena alibi witnesses. However, petitioner's *habeas* counsel makes those assertions without elaboration and, as a result, falls far short of meeting the burden of proof to support such claims.

For example, a petitioner asserting a claim for inadequate investigation bears the burden to provide *factual support* as to what further investigation would have revealed. See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005). In the instant case, *habeas* counsel does not even allege what exculpatory evidence, other than the purported unidentified alibi witnesses, might possibly have been revealed by further investigation, much less provide factual support for those allegations.

Further, as to those supposed alibi witnesses, petitioner again fails to meet the requisite burden of proof. It is clear that "complaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified are largely speculative." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Therefore, to show the prejudice required to support an ineffective assistance claim premised on the failure to call a witness, a

petitioner "'must show not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" Id. (quoting Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985)). In connection with the instant petition, counsel has provided no evidence whatsoever showing that unidentified witnesses could have in fact provided petitioner with an alibi and would have testified to that fact at trial.

Moreover, even if the Court independently attempts surmise the identity of the witnesses to whom *habeas* counsel *may* be referring, the Court remains unconvinced that a viable claim exists. Petitioner identified some purported alibi witnesses for the first time in his 2002 motion for reconsideration and again in his 2005 state post-conviction application.[24] In connection with the state-court motion for reconsideration, petitioner presented purported affidavits completed by Barbara Santiago, Charlotte Williams, Deatrice Caston, Johnel Sartain, and Jasmin Sartain.[25] The state courts never considered the content or authenticity of those affidavits;[26] however, even if this Court were to assume that these are the witnesses to whom *habeas* counsel obliquely refers and were

---

[24] When he had previously asserted this claim on direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected the claim, noting that petitioner had not identified the purported alibi witnesses or provided a summary of their testimony. Petitioner then again asserted the claim in his first state post-conviction application; however, the claim was denied because it had been addressed in the direct appeal.

[25] State Rec., Vol. II of VI. Petitioner also submitted an affidavit form for his uncle, Andrew Johnson; however, that affidavit was not signed.

[26] As noted, the state district court apparently never ruled on the motion for reconsideration and the 2005 post-conviction application was dismissed as untimely without a consideration of the merits of the claims.

further in the first instance to consider the affidavits, the Court would find that they were insufficient to support an ineffective assistance of counsel claim for the following reasons.

Petitioner contends that he was in Texas when the robberies occurred on October 29, November 3, and November 7, 1994. In connection with that contention, he offered the affidavits of Deatrice Caston and Johnel Sartain, in which they stated that petitioner, their brother, helped Deatrice move to Texas on October 26, 1994, and did not leave Texas until November 9, 1994. He also offered the affidavit of Charlotte Williams, a family friend, in which she stated that "Deatrice and her brothers" went to Texas on October 26; however, petitioner was not specifically named in that affidavit. Lastly, he offered an affidavit from his nephew, Jasmine Sartain, in which he also stated that petitioner helped Deatrice move to Texas on October 26.[27]

Petitioner further contends that Barbara Santiago and Johnel Sartain could have provided an alibi for the armed robbery on November 11, 1994. As previously noted, Sabrina Bridges testified that petitioner robbed her while she worked at a Texaco service station on November 11, 1994, at approximately 7:25 a.m. However, Santiago stated in her affidavit that she and petitioner were together at her home on November 11, 1994, from approximately 7:00 a.m. until 9:30 a.m. Johnel Sartain stated in his affidavit that he dropped off petitioner at Santiago's home at approximately 7:00 a.m. on November 11.

*Even if* those potential witnesses would have agreed to testify in conformity with their affidavits, counsel still should not be considered ineffective for failing to call them. There is a

---

[27] In the unsigned affidavit, Andrew Johnson would have allegedly stated that petitioner, Deatrice, Johnel, and Jasmin arrived at his home in Texas on October 26, 1994, and that petitioner and Johnel left Texas on November 9.

- 15 -

strong presumption that counsel's decision regarding whether to call a witness is one of trial strategy.  Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); see also Green v. Cockrell, No. 02-20650, 2003 WL 21145722 , at *2 (5th Cir. Apr. 29, 2003) ("A strategic or tactical decision not to call particular witnesses does not constitute ineffective assistance."); Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints based upon uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.").  The United States Supreme Court has cautioned courts not to second-guess counsel's decisions on such trial tactics through the distorting lens of hindsight; rather, courts are to employ a strong presumption that counsel's conduct falls within a wide range of reasonable assistance and, under the circumstances, might be considered sound trial strategy.  Strickland, 466 U.S. at 689.

> As the United States First Circuit Court of Appeals has explained:
>
> > The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.  The witness may not testify as anticipated or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused.

Lema v. United States, 987 F.2d 48, 54 (1st Cir. 1993) (citations omitted).  The court further noted:

> Reasonably competent trial counsel might well have determined that the best prospect for acquittal lay in discrediting the government's witnesses, rather than presenting additional testimony which could appear to legitimate the government's case or raise questions about the defense not previously suggested by the government's evidence.

Id.  Additionally, the court found:

> The decision to *interview* potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case. Counsel need not chase wild factual geese when it appears, in light of informed professional judgment, that a defense is implausible or insubstantial as a matter of law ....

Id. at 55 (emphasis in original) (citations and quotation marks omitted).

In the instant case, there was considerable evidence of petitioner's guilt presented at trial by *unbiased* witnesses, including the victims of the four separate offenses who independently identified petitioner as the person who robbed them. In light of that fact, this Court cannot say that counsel performed deficiently in opting to avoid potentially alienating jurors by presenting a dubious alibi defense based solely on the inherently suspect testimony of petitioner's family and friends. Moreover, even if it were *assumed* that counsel was deficient in that respect, petitioner's claim nevertheless fails because he cannot establish resulting prejudice. In light of the victim testimony, Barnes' testimony, and the physical and photographic evidence, the Court simply has no basis for finding that there is a reasonable probability that the result of the proceeding would have been different if only the family and friends had been called to testify. See, e.g., Johnson v. Mann, No. 92 Civ. 1909, 1993 WL 127954, at *1 (S.D.N.Y. 1993); Munoz v. Keane, 777 F.Supp. 282, 288-89 (S.D.N.Y. 1991), aff'd sub nom. Lianres v. Senkowski, 964 F.2d 1295 (2nd Cir. 1992).

Petitioner's final claim is that his trial counsel was ineffective in failing to obtain the necessary equipment to view the surveillance videotape and in failing to use the videotape at trial.[28]

---

[28] The Court notes that this claim was never considered on the merits by the state courts. The Louisiana Fourth Circuit Court of Appeal declined to address the claim on direct appeal. Sartain, 746 So.2d at 850. The state district court then refused to address the issue when presented in the first post-conviction application, wrongly finding that it had been addressed on appeal. State Rec.,

- 17 -

At trial, only still photographs taken from the videotape were introduced. While this Court might agree that the videotape itself may have provided a better view of the robber than the still photographs, it is precisely that danger that defense counsel may have wished to avoid. In light of the considerable evidence of petitioner's guilt, there is simply no reasonable basis for concluding that he was *not* the person pictured in the videotape, and petitioner certainly has provided no compelling evidence to that effect. Without more, this Court simply cannot find that counsel performed deficiently in electing not to pursue introduction of a videotape which might well have confirmed beyond any doubt petitioner's involvement in the crime. A tactical decision not to run the risk of compounding the damning evidence against petitioner is hardly unreasonable. See Thompson v. Cain, 161 F.3d 802, 813-14 (5th Cir. 1998).

For all of the foregoing reasons, the undersigned finds that petitioner has not met his burden of proof with respect to his ineffective assistance of counsel claims and therefore recommends that they be dismissed on that basis.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Darryl Sartain be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

---

Vol. V of VI, Judgment dated January 25, 2001.

court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

       New Orleans, Louisiana, this    15th    day of September, 2008.

 

LOUIS MOORE, JR.
**UNITED STATES MAGISTRATE JUDGE**